IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2018

## IN RE GABRIEL B.

**Appeal from the Juvenile Court for Madison County**
**No. 57-51464     Christy R. Little, Judge**

_____

**No. W2017-02514-COA-R3-PT**

_____

A juvenile court terminated a father's parental rights on the grounds of abandonment by willful failure to support, substantial noncompliance with permanency plans, and persistence of conditions. The father appeals the termination of his rights. We conclude that the evidence clearly and convincingly supports the trial court's termination on these grounds and affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Vacated in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Bob C. Hooper, Brownsville, Tennessee, for the appellant, Brock R.B.

Herbert H. Slatery, III, Attorney General and Reporter, and Alexander S. Rieger, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Jessica M.S. ("Mother") and Brock R.B. ("Father") are the parents of Gabriel B., born in November 2014. On December 1, 2015, Mother, Father, and Gabriel were at a Walmart in Jackson when Mother and Father were arrested and charged with shoplifting. Mother and Father were incarcerated at a local jail, and the Tennessee Department of Children's Services ("DCS" or "the Department") received a report stating that Gabriel was without supervision. The Department took custody of Gabriel and filed a petition to adjudicate him dependent and neglected on December 4, 2015. The Department asserted in its petition that a child and family team meeting was conducted on December 4 and

that Mother reported during this meeting that Father had broken her arm not long before. According to DCS's petition, Mother stated that she did not want Gabriel to be placed with Father because of Father's drug use, which included crack cocaine.

The trial court issued a protective custody order on December 4, 2015, finding Gabriel dependent and neglected and notifying the parents of their obligation to provide child support for Gabriel in accordance with Tenn. Code Ann. § 37-1-151. On December 28, 2015, a DCS family service worker met with Father, Father's attorney, a guardian ad litem, and the foster parents to discuss a family permanency plan.[1] The permanency plan listed dual goals of "return to parent" and "exit custody with relative." Father was awarded supervised visits with Gabriel, and his responsibilities under the plan included completing parenting classes and providing DCS with a certificate of completion; completing an alcohol and drug assessment and following a therapist's recommendations; and submitting to random drug screens. Father signed the permanency plan on December 28, 2015, and the trial court ratified it on January 21, 2016. The permanency plan did not have attached to it the Criteria and Procedures for Termination of Parental Rights ("Criteria and Procedures for TPR"), but the trial court noted in its order ratifying the plan that it "fully explained the Termination of Parental Rights Criteria" to Father at the hearing on January 21, 2016.

A second family permanency plan was created on September 1, 2016. The permanency goals of this plan included "exit custody with relative" and "adoption." The Department indicated that Father's lack of progress justified the change in goals and stated that Gabriel was not ready to leave state custody because Father was still using drugs, he was missing visitation sessions with Gabriel, and he lacked stability. Father's visitation with Gabriel was continued under this plan, and his responsibilities included completing alcohol and drug treatment; providing the name of his probation officer to the DCS case manager; submitting to random urine, saliva, hair and/or nail drug screens; completing a program for driving under the influence ("DUI"); completing counseling to address anger management and domestic abuse; providing DCS with check stubs to verify his employment; and providing DCS with a copy of his lease agreement to verify housing. Father signed the permanency plan on December 15, 2016. A copy of the Criteria and Procedures for TPR was attached to this permanency plan, and Father signed a statement acknowledging his receipt of a copy and explanation of its contents on the same day, December 15, 2016. The trial court ratified this second permanency plan on March 16, 2017.

The Department developed a third permanency plan on March 30, 2017. This plan listed the first permanency goal as "adoption" and the second goal as "exit custody with

---

[1]Mother consented to the termination of her parental rights to Gabriel and has not filed an appeal. Thus, we will not address Mother's responsibilities under the permanency plans or her rights to Gabriel in this opinion.

kin."[2] The plan stated that Gabriel was still unable to leave state custody because Father had not yet satisfied his responsibilities from the prior plan. The Department noted on this plan that Father had completed parenting classes and earned his certificate and that he had completed an alcohol and drug assessment. The Department stated its concern about Father's residential stability because Ms. Anderson had met Father at an address Father provided but was unable to enter the property Father asserted he owned.[3] Father's responsibilities in this third permanency plan included complying with the Department's home study at the address Father identified as his, including permitting the family service worker assigned to his case ("FSW") to visit the home, take photographs, and ensure no safety risks were present, and providing DCS with a quit claim deed to prove his ownership of the property. The permanency plan noted that Father had tested positive for cocaine in January 2016 and April 2016. The plan required Father to maintain a sober lifestyle by completing a DUI program, undergoing another alcohol and drug assessment, and providing the assessor with a copy of all prior drug screens; providing the FSW with the name of Father's probation officer; and completing another hair follicle drug test by March 31, 2017, as well as submitting to additional random urine, saliva, hair and/or nail drug screens. Finally, the permanency plan required Father to show he had legitimate sources of income by providing the following to DCS: pay stubs, bank statements, and a copy of the prior year's federal tax return, including his W-2 and/or 1099 form(s). Father signed the permanency plan and the Criteria and Procedures for TPR on June 15, 2017. The trial court ratified this third plan on July 6, 2017.

The Department filed a petition seeking to terminate Mother's and Father's parental rights to Gabriel on May 31, 2017.[4] The grounds DCS cited in support of its petition against Father included abandonment by failure to visit or support; abandonment by failure to establish a suitable home; abandonment by incarcerated parent (wanton disregard); substantial noncompliance with the permanency plans; and persistence of conditions. The trial court held a trial on October 3, 2017. Father did not attend the trial, but he testified by telephone. Father explained that he was unable to make it to court for the trial because his wife was eight and a half months pregnant with his child, she was dying from brain cancer, and he had to take her to the hospital the night before the trial. Mother was incarcerated in a different state and participated in the first part of

---

[2]Alice Anderson, the family service worker ("FSW") assigned to this case, explained the difference between "kin" and "relative." She said that "kin" referred to a "non-blood related relative," whereas "relative" referred to a blood relative.

[3]When DCS sent a letter to Father at this address, the FSW received a call from a man claiming to be the owner of the property. The man reported that he did not know Father and that Father did not live at that address. The man stated that he had lived at that address for ten years and that the property was not for sale.

[4]Because Mother did not challenge the Department's petition to terminate her rights, we will focus our attention on the Department's allegations against Father and will not address the Department's allegations against Mother.

the trial by telephone. In support of its petition, the Department offered the testimony of the FSW Alice Anderson; Jasmin Parks, who was an employee at the Carl Perkins Center in Jackson, where Father exercised supervised visitation with Gabriel; and one of the foster parents, Katie R.

Following the presentation of evidence, the parties asked the trial court to hold the record open for a few more days to give them an opportunity to supplement the record with additional documents. The court agreed and held the record open until Friday, October 6, 2017. The court entered an order on November 28, 2017, terminating Father's parental rights to Gabriel. It found that the Department proved the following grounds for termination by clear and convincing evidence: abandonment by failure to support; abandonment by failure to provide a suitable home; substantial noncompliance with the permanency plans; and persistence of conditions.[5] After conducting a best interest analysis, the court found termination of Father's parental rights was in Gabriel's best interest. Father appeals, arguing that the trial court erred (1) by finding the evidence clearly and convincingly proved he had not substantially complied with the permanency plans and (2) by failing to dismiss the petition to terminate his rights because the Criteria and Procedures for TPR was not attached to the initial permanency plan.

## II. STANDARD OF REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions

---

[5]The Department informed the trial court at the start of the trial that it was not pursuing the ground of abandonment by failure to visit against Father because Father had visited Gabriel in the four months preceding the date it filed the termination petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (abandonment by failure to visit is established by showing parent has not visited child in the four months preceding filing of termination petition). The court concluded DCS failed to prove the ground of wanton disregard by clear and convincing evidence, and DCS does not challenge this portion of the judgment on appeal.

of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. CONST. amend. XIV, § 1; TENN. CONST. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights only in certain circumstances. *Id.*; *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A. Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384

S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" Father's parental rights. *Id.* (citing *In re Tiffany B.*, 228 S.W.3d at 156, and *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004)). "When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to witnesses' credibility." *Id.* (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

Father challenges only one ground for termination — that he had not substantially complied with the permanency plans. However, our Supreme Court requires that we "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. Thus, in addition to the issues Father raises on appeal, we will address each ground for termination that the trial court found the Department established by clear and convincing evidence as required by *In re Carrington H.*[6]

---

[6]On appeal, the Department elected not to defend the trial court's termination of Father's rights based on his failure to provide a suitable home "because the record does not identify any reasonable efforts made by the Department within the four-month period applicable to the suitable-home ground." As a result of the Department's position, we will not review the trial court's findings with respect to this ground, and we vacate the trial court's termination of Father's parental rights based on his failure to provide a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii) (requiring Department to make "reasonable efforts to assist the parent . . . to establish a suitable home for the child").

III. ANALYSIS

A. Grounds for Termination

1. Abandonment by Failure to Support

One of the grounds the legislature has determined constitutes a basis for terminating an individual's parental rights is "abandonment," as that term is defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Section 36-1-102(1)(A)(i) defines abandonment, in part, as a parent's willful failure to support or make reasonable payments towards the support of a child for a period of four consecutive months immediately preceding the filing of a termination petition.[7] A parent's "support" or "reasonable payments toward such child's support" must be "more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "Token support" is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). The Department filed the petition to terminate Father's parental rights on May 31, 2017. Thus, the relevant four-month period we consider to determine whether Father willfully abandoned Gabriel by failing to support him runs from January 31 to May 30, 2017.

"Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d at 863. A parent's failure to support is "willful" if he or she "'is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.'" *Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)). If a parent's failure to support is out of his or her control, that parent's failure will not be deemed "willful." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). Whether a parent has failed to support a child is a question of fact, but whether a parent's failure to support a child was willful is a question of law. *Id.*; *see also In re Alysia S.*, 460 S.W.3d 536, 566 (Tenn. Ct. App. 2014).

Father admits that he did not provide any monetary support for Gabriel during the relevant four-month period. Father testified on this issue as follows:

---

[7]The statute defining "abandonment" was amended effective July 1, 2018, and as amended, Tenn. Code Ann. § 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment." Instead, Pub. Ch. 875, § 2, codified at Tenn. Code Ann. § 36-1-102(1)(I), makes the absence of willfulness an affirmative defense to abandonment for failure to visit or support. The parent (or guardian) will have to prove by a preponderance of the evidence that the failure to visit or support was not willful. Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case. *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004).

Q: So let me ask you this now. Since the time Gabriel has been in custody since December the 4th, 2015, how much have you contributed to the financial upkeep of Gabriel?

A: Well I didn't know I was supposed to contribute. I do as best I can. I did at the beginning ask [the foster parents] if they needed anything, that I would be willing to help them. I do bring toys and snacks and everything that I possibly can when I come to visit [Gabriel], that he carries home with him. I spend a hundred to two hundred [dollars] of course each time I see him. Any time if they have ever needed anything I would have been more than willing to give it to them but I didn't know if it would be a conflict of interest or not. I don't know how these things work. I've never been ordered to give any money so I don't know.

The Department introduced records from the Carl Perkins Center that described Father's visits with Gabriel. These records show that Father brought Gabriel gifts on three different occasions during the relevant four-month period.

The Department counters Father's testimony that he was not aware that he was required to pay support for Gabriel by pointing to the trial court's order dated December 4, 2015. In that order, the trial court notified Mother and Father of "their liability for child support pursuant to T.C.A. § 37-1-151 . . . from the effective date of the court's order placing the child in state custody." We also note that Father was provided with the Criteria and Procedures for TPR on at least two different occasions, and this form states in bold letters that his parental rights can be terminated for "[w]illfully failing to pay child support regularly for four consecutive months, or failure to pay more than a small amount of support, if it is established that [he has] the ability to pay for support." Father signed a statement on December 15, 2016, and another statement on June 15, 2017, indicating that he received a copy of the Criteria and Procedures for TPR and was provided an explanation of its contents.

In response to questions about his income, Father testified that he had four businesses and that his annual income was three to six million dollars. Father explained that this money was in a trust agreement and that he received monthly distributions:

I get $16,000.00 a month paid to me out of the businesses and ran by the trust. . . . I draw from [the trust] if I want to but I don't deplete the trust. I let them run it. I get my interest, sixteen thousand dollars per month automatically deposited into my account. I can live off of that comfortably.

Father was asked how long he had been receiving this amount of money, and he responded that he had been receiving that money for a year, which period includes the four-month period at issue. He explained that three of the businesses were his wife's, but

- 8 -

they had been transferred to him, and the other business was his. The Department asked Father what his expenses were, and Father responded:

> Just regular day to day expenses. I just buy what I want and do - - if I need anything above the sixteen thousand dollars I call my banker and I go and I send for the money and it is taken care of. I work still.

In its order terminating Father's parental rights, the trial court found that Father provided only "token support" to his child during the relevant period and that the Department proved the ground of abandonment by willful failure to support by clear and convincing evidence:

> The visitation records do not reveal that [Father] brought gifts/toys to each visit. While snacks were present at each visit, the visitation record reveals that the snacks were typically already in Gabriel's backpack and [Father] merely fed the snacks to Gabriel.
>
> In addition, there were indeed toys present at each visit but the toys were for the most part already in the visitation room and [Father] and Gabriel selected the toys that they desired for playing purposes during the visitation sessions. The Court found that any gifts that [Father] provided were merely token in light of his testimony regarding his income.
>
> [Father] also testified that he had recently purchased a 1.2 million dollar home in the Pigeon Forge area . . . and a home in Counce, Tennessee. However, despite his substantial business enterprises (four businesses; his substantial monthly interest income and significant annual income), he only provided token gifts to his son.
>
> . . . .
>
> The Court found that with all of the money that [Father] said that [he] had, that he should not have had to be told [to pay support] or given a court order to pay [support]. Based on [Father's] testimony regarding his finances, and despite being financially able to do so, he willfully failed to contribute to the support or make reasonable payments towards the support of said child for more than four (4) consecutive months prior to the filing of this Petition and therefore his parental rights should be terminated. According to [Father], he lived comfortably off the $16,000 monthly interest income and . . . he could buy whatever he wanted. Unfortunately, providing on-going financial support to his child, Gabriel, did not factor into his financial equation. As to [Father], the Court found that the

Department proved the ground of abandonment by failure to support by clear and convincing evidence.

The trial court also addressed Father's credibility, stating:

> I questioned [Father's] ability not to get to court today [and] his credibility to be a home owner . . . . There are many, many things that I question. The only thing I believe is that he does love his child . . . .

As the party filing the termination petition, DCS carried the burden of proving by clear and convincing evidence that Father abandoned his child by willfully failing to support or to make reasonable payments toward his support during the relevant four-month period. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-102(1)(A)(i). The Department was required to prove that Father "had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *In re Adoption of Angela E.*, 402 S.W.3d at 641.

Courts consider a parent's income as well as the resources available for the payment of debts in determining whether the parent's support or payments towards the support of a child are merely token payments. *Id.* (citing *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 n.24 (Tenn. Ct. App. June 3, 2003)). "A parent's financial support of his or her child will not be deemed to be 'token' unless it is 'insignificant' in light of the parent's 'means.'" *In re Z.J.S.*, 2003 WL 21266854, at *11 (quoting Tenn. Code Ann. § 36-1-102(1)(B)). The Department did not introduce into evidence bank statements or other documentation reflecting Father's assets or income, but Father testified that he earned $16,000 a month in interest income and that he was able to meet his expenses and live comfortably. Father's testimony that he was not aware of his obligation to pay support for Gabriel does not excuse his failure to pay. The legislature presumes a parent who is at least eighteen years old is aware of his or her legal obligation to support his or her child, even if there is no court order requiring the parent do so. Tenn. Code Ann. § 36-1-102(1)(H); *In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017); *David A. v. Wand T.*, No. M2013-01327-COA-R3-PT, 2014 WL 644721, at *8 (Tenn. Ct. App. Feb. 18, 2014). Moreover, the trial court's order dated December 4, 2015, unequivocally directed Father to pay child support. In light of Father's testimony regarding his income and his acknowledgement that he paid nothing towards the support of Gabriel during the relevant period, we agree with the trial court's conclusion that the few gifts he provided during his visits constituted merely token support. *See In re Braxton M.*, 531 S.W.3d at 721, 725 (affirming trial court's ruling that father's gifts to child during four-month period constituted no more than token support); *In re Keri C.*, 384 S.W.3d at 737-39, 746-47 (affirming trial court's determination that mother willfully failed to support child despite her provision of gifts to child during relevant four-month period).

Our review of the record leads us to conclude that the evidence clearly and convincingly showed that Father had the ability to support or make reasonable payments towards the support of Gabriel and had no justifiable excuse for failing to do so. Accordingly, we affirm the trial court's judgment that Father's parental rights should be terminated based on his willful failure to support Gabriel during the relevant four-month period.

## 2. Substantial Noncompliance with Permanency Plans

A parent's rights can be terminated if he or she is substantially noncompliant with the statement of responsibilities in a permanency plan that complies with the requirements of title 37, chapter 2, part 4. Tenn. Code Ann. § 36-1-113(g)(2). Tennessee Code Annotated section 37-2-403(a)(2) requires that the permanency plan for each child in foster care include a statement of responsibilities between the parent(s), the agency, and the caseworker of the agency; the statements identify each party's responsibilities in specific terms; and the statements be reasonably related to remedying the conditions that necessitated foster care placement. This ground for termination does not require DCS to use reasonable efforts to assist a parent in complying with the requirements of a permanency plan. *In re Kaliyah S.*, 455 S.W.3d at 555 (holding that "proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent"); *see also In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *7 (Tenn. Ct. App. June 21, 2017).

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.

*In re M.J.B.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 547-49; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003); *In re Z.J.S.*, 2003 WL 21266854, at *12; *Dep't of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003)). Although the statute does not define "substantial noncompliance," our Supreme Court has explained that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "'[P]ermanency plans are not simply a series of hoops for the

biological parent to jump through in order to have custody of the children returned.'" *In re Derrick J.*, No. E2015-01507-COA-R3-PT, 2016 WL 3752013, at *11 (Tenn. Ct. App. July 8, 2016) (quoting *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006)). Instead,

> "the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself [or himself] in a position to take responsibility for the children."

*Id.* (quoting *In re C.S., Jr.*, 2006 WL 2644371, at *10).

The Department was required to remove Gabriel from Father and Mother's custody when they were arrested for shoplifting in December 2015. Mother testified that she and Father were both using illegal drugs and that they went to the Walmart on the day they were arrested for the purpose of shoplifting and to be able to acquire more illegal drugs. Father underwent a hair follicle drug test on January 29, 2016, and he tested positive for cocaine, benzoylecgonine, and cocaethylene. Father underwent a second drug test on April 27, 2016, and he again tested positive for cocaine and benzoylecgnonine. The Department added more responsibilities to the second permanency plan because Father had failed to complete all of the goals set out in the first plan and because of the Department's concerns about Father's drug use, his failure to show up at all of his scheduled visits with Gabriel, and his overall stability.

While the second permanency plan was in force, Ms. Anderson attempted to conduct a home study in March 2016 and met Father at a house he said he owned in Counce, Tennessee. Ms. Anderson became concerned about Father's veracity when he was unable to get past the locked gates in the driveway and after Ms. Anderson received a call from a man who claimed he, and not Father, owned the house. Ms. Anderson testified about this as follows:

> [Father] notified me in December of 2016 he had purchased a home in Counce, Tennessee. I requested to visit the home and complete a home study. He eventually agreed to meet with me at that home in March of 2016.
>
> When I arrived to the property, we were unable to get past the gates. [Father] stated that the codes had been changed that day, and we were unable to get in. He also stated we couldn't access the home because it was

being fumigated because of a child that was supposed to be living in their home, that Ms. Marcia[8] had gave him custody to.

I was never able to enter the property of the home. Following that, I did mail [Father] a meeting notice to that address in Counce, Tennessee. I received a phone call from [an unknown third party] who stated he owns the property.

By the time the third permanency plan was put into place, conducting a home study had become a priority because Father had not yet provided Ms. Anderson with a residence that she could visit. Ms. Anderson testified that Father never provided her with a lease of an apartment or house he was renting, nor did he ever provide her with any documentation reflecting his ownership of any house(s) he claimed to own. At trial, Father described a house he claimed to own in Pigeon Forge, and he agreed to send documentation to his lawyer reflecting his ownership that would be included in the record as a late-filed exhibit. However, the appellate record does not include this documentation, and Father did not address this issue in his appellate brief.

Ms. Anderson testified that Father missed several scheduled visits with Gabriel between October 2016 and trial. She testified that she went to meet with him at Carl Perkins on September 27, 2017, prior to trial, but that he did not show up for his visit with Gabriel on that day. In fact, she stated, Father did not visit Gabriel in July, August, or September 2017.[9] Father also never provided Ms. Anderson with verification of his income despite this being a requirement in both the second and third permanency plans.

The record shows that Father was arrested in March 2016 for driving under the influence. He was arrested again in August 2016 and charged with impersonating an undercover agent with the Federal Bureau of Investigation, domestic assault, resisting arrest, disorderly conduct, aggravated assault, and driving under the influence. Father pleaded guilty to these charges and was sentenced to serve just under one year in the county jail. Father was placed under supervised probation for eleven months and two days of his sentence. Father did not testify that he provided Ms. Anderson with the name of his probation officer, as he was required to do under the second and third permanency plans.

The second permanency plan required Father to undergo alcohol and drug treatment. The third permanency plan indicated that Father had completed an alcohol and drug assessment on March 28, 2016, and that the results showed that Father "did not

---

[8]"Ms. Marcia" refers to the woman Father said was his wife.

[9]Ms. Anderson explained that she was aware of the visits Father missed because a worker from Carl Perkins contacted her any time Father failed to show up for a scheduled visit with Gabriel.

warrant out-patient treatment substance abuse treatment at that time." However, the third plan continued, Father's drug test the following month, on April 27, 2016, was positive for cocaine. As a result, the third plan required Father to undergo another alcohol and drug assessment, and Father was directed to "participate honestly with said assessment and provide assessor a copy of ALL his prior drug screens." Father was required to sign a release allowing the FSW to have a copy of his results/recommendations. Ms. Anderson testified that she never received information that Father complied with this requirement by sharing any of his positive drug screens with an alcohol and drug assessor, as required.

Father was also required by all three permanency plans to undergo random drug screens. Ms. Anderson testified that Father was asked to undergo a hair follicle drug test on March 31, 2017, but that he refused to have this test done until June 2017. Ms. Anderson testified:

> [Father] did not complete the hair follicle test in March. It was requested again in April. He did not complete the test in April. [Father] did volunteer to complete the test in June.

Ms. Anderson explained that by the time Father agreed to be tested in June 2017, the test came back negative.

The trial court found that DCS proved the ground of substantial noncompliance with the permanency plans by clear and convincing evidence. The court found that Father complied with the plans' requirements that he complete parenting classes and provide verification thereof and complete a DUI program as outlined by the court. The court found that Father failed to comply with the plans' requirements that he (1) provide DCS with a copy of his paystub to verify employment; (2) provide DCS with a copy of a lease to verify housing; (3) complete anger management and domestic abuse counseling; (4) provide DCS with the name and contact information of his probation officer;[10] and (5) provide the alcohol and drug assessor with his prior positive drug screens and a copy of his DUI record. The court further found that Father failed to complete the drug screen requested of him on March 31, 2017, which date was specifically identified in the third permanency plan, and that he refused to submit himself for a hair follicle test until "some sixty days subsequent to the original March 31, 2017 mandated date." The court also noted that Father missed nineteen of fifty-six scheduled visits with his child, which the court found qualified as substantial noncompliance with the requirement that Father "attend visitation as scheduled."

---

[10]According to the transcript, Ms. Anderson testified that "Father did provide information for his probation officer," but the trial court found that he did not. It appears that the court reporter may have missed the "not" in Ms. Anderson's testimony because the trial court found that Father did not provide this information to DCS and Father's attorney did not challenge this finding, either following the order's entry or on appeal.

The trial court wrote:

These requirements are all reasonably related to remedying the conditions that necessitate foster care. These requirements are particularly important in reducing the risk of harm to the child so that the child could be safely returned to the parents' care. DCS made reasonable efforts to assist [Father] in complying with the requirements in the permanency plan. [Father] was advised that failure to substantially comply with the permanency plan was grounds for termination of parental rights.

Father does not challenge the trial court's findings that his responsibilities under the plans were reasonably related to remedying the conditions that caused Gabriel to be removed from his custody in December 2015. Rather, Father argues that the trial court erred in ruling that he had not substantially complied with the requirements of the permanency plans because he missed only nineteen of fifty-six visits with his son, he addressed all of his alcohol and drug issues, he did not test positive for any illegal substances after April 2016, and he completed the requisite parenting classes.

A review of the notes from Carl Perkins reveals that Father called many times in advance of the dates when he was unable to get to the center to visit with Gabriel, and he made an effort to reschedule some of the visits he missed, but he did not call or show up for at least five scheduled visits and was unresponsive to phone calls from Carl Perkins to find out if he was on his way or not able to make it at all that day. Moreover, Ms. Anderson testified that Father did not visit his son once in the three months prior to trial.

In addition to Father's missed visits, DCS was never able to complete a home study to determine if Father's living situation was appropriate for raising a young child, and Father failed throughout the pendency of this case to verify his employment or financial situation to show he was able to provide for Gabriel.[11] Father was required to seek counseling for anger management and domestic abuse, and no evidence was introduced that Father complied with this requirement. This is especially concerning in light of (1) Mother's report to the Department in December 2015 that Father had broken her arm during a domestic dispute and (2) Father's arrest in July 2016 for domestic assault and aggravated assault. Father refused to undergo a drug test as required on March 31, 2017, and he did not present himself for this purpose until over two months later, when the test came back negative. Father's refusal to be tested in March, April, or May suggests that he may not have had a negative result in those months.

We agree with the trial court's determination that the requirements of the permanency plans were reasonable and related to remedying the conditions that caused

---

[11]Father was given an opportunity to supplement the record following the trial to provide documentation of his financial situation and of his home ownership, but the appellate record does not include any additional documents from Father.

- 15 -

Gabriel to be removed from Father's custody in December 2015 and that Father's noncompliance was substantial in light of the importance of the requirements that he failed to meet. *See In re M.J.B.*, 140 S.W.3d at 656-57 (discussing requirements for proving substantial noncompliance with permanency plans). Accordingly, we affirm the trial court's determination that DCS proved this ground for the termination of Father's rights by clear and convincing evidence.

<u>Criteria and Procedures for TPR</u>

Father argues in his appellate brief that the Department's petition to terminate his rights should be dismissed because DCS failed to attach a copy of the Criteria and Procedures for TPR to the first permanency plan. Father made the same argument at trial, to which the trial court responded in its written order:

> Termination of Parental Rights Criteria Forms are not part of the Permanency Plans and do not have to be attached to a specific permanency plan. Termination of Parental Rights Criteria Forms are utilized to put a parent on notice regarding termination of parental rights grounds, including but not limited [to] termination for failure to substantially comply with the permanency plan requirements.

> The Permanency Plans dated December 28, 2015, September 1, 2016, and March 30, 2017, respectively, were admitted without objection into the record. Termination of Parental Rights Criteria Forms were attached to the September 1, 2016, and March 30, 2017, Permanency Plans. [Father] signed three (3) Criteria and Procedures for Termination of Parental Rights documents during the pendency of the case and had the contents explained to him.

> Further, as stated on the record, at the October 3, 2017, Termination Hearing; an Order from the January 21, 2016, hearing that ratified December 28, 2015, Permanency Plan, clearly stated that the Court fully explained the Termination of Parental Rights Criteria to [Father] on the January 21, 2016 hearing date. . . .

> A Criteria and Procedures for Termination of Parental Rights Document was signed by [Father] on May 18, 2016. This Criteria Form was not attached to a specific permanency plan but was reviewed by the Family Service Worker and [Father] on May 18, 2016, in an ongoing effort to keep [Father] aware of the Criteria and Procedures for Termination of Parental Rights.

- 16 -

The statute governing the contents of permanency plans directs DCS to include a statement with the plans that describes the criteria and procedures for terminating parental rights. Tenn. Code Ann. § 37-2-403(a)(2)(A). The statute also directs that "[e]ach party shall sign the statement and be given a copy of it." *Id.* The statute does not indicate, however, that a permanency plan becomes invalid if DCS neglects to attach to it the Criteria and Procedures for TPR, and Father does not cite any cases that suggest this should be the result.

In its order ratifying the first permanency plan, the trial court wrote that it "fully explained the Termination of Parental Rights Criteria to the father on the hearing date." Thus, Father cannot credibly argue he was unaware of the contents of the Criteria and Procedures for TPR once the hearing ratifying the first plan took place on January 21, 2016. Furthermore, there is no question that the Criteria and Procedures for TPR were attached to the second and third permanency plans and that Father signed each of these statements as required by the statute. The purpose of requiring the Criteria and Procedures for TPR to be included with permanency plans is to make sure the parent or guardian is aware of the grounds and procedures for terminating his or her parental or guardianship rights and of what he or she must do to avoid having his or her rights terminated. This purpose was achieved when the trial court explained the contents of the document to Father on January 21, 2016, as well as when Father signed the statements affirming that he had received a copy and an explanation of the document on December 15, 2016, and June 15, 2017, the dates when the second and third permanency plans were signed. Thus, Father's argument that the Department's petition to terminate his rights should be dismissed because DCS failed to attach a copy of the Criteria and Procedures for TPR to the first permanency plan is not well-taken.

3. Persistence of Conditions

In addition to the other grounds, the trial court based its decision to terminate Father's parental rights on the ground commonly referred to as "persistence of conditions." The requirements for this ground include the following:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (2017).

The persistence of conditions ground is only available in situations where a court has entered an order that the child at issue was removed from a parent's custody due to dependency, neglect, or abuse. *In re Audrey S.*, 182 S.W.3d at 874. The rationale for including this ground as a basis for terminating a parent's rights is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *6 (Tenn. Ct. App. May 28, 2014) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)). The Department is not required to demonstrate that Father's relationship with his child is beyond repair or that Father poses a danger to Gabriel's safety or emotional health before a court can find DCS has established this ground. *Id.* (citing *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000)).

In determining that DCS proved the persistence of conditions ground by clear and convincing evidence, the trial court wrote:

> There are conditions that prevent the child's return to [Father's] home. As more fully set out above, [Father] has not substantially complied with the permanency plan requirements. Further, as set out in the order above, [Father] does not [have] stable housing and/or has not provided the Court with evidence of stable, safe, suitable housing. The Court found that [Father] did not have stable housing, [a] permanent home. The Court found that [Father] was moving from place to place. The Court further found that the child needs the stability of a home. The Court found that the only condition that had changed for [Father] was changing from one woman, [Mother] to another woman, Marcia.

> The Court found that DCS made reasonable efforts to assist the parent(s) in remedying the conditions that necessitate foster care. [Father] has failed to manifest an ability and willingness to assume legal and physical custody of the child. Placing the child in [Father's] custody would pose a risk of substantial harm to the physical or psychological welfare of the child. The Court found that DCS had proven the ground of persistence of conditions in that conditions exist that prevent the return of the child to [Father's] care, custody and control.

We agree with the trial court that DCS proved this ground by clear and convincing evidence. First, the trial court entered a preliminary, adjudicatory, and dispositional order on December 17, 2015, finding that DCS proved by clear and convincing evidence that Gabriel "is dependent and neglected within the meaning of the law." Father did not appeal this order. Second, we find that the Department has established by clear and convincing evidence that the conditions that led to Gabriel's removal or other conditions which in all reasonable probability would cause Gabriel to be subjected to further neglect and prevent Gabriel to be returned safely to Father's care still persist. Gabriel was initially removed because Mother and Father were placed in jail, which left Gabriel with no home or caretakers. Despite the Department's repeated requests, Father never provided DCS with the address of a residence where DCS could perform a home study. The reason Mother and Father were arrested and jailed when Gabriel was placed in state custody was because they were shoplifting, and the evidence showed they were shoplifting for the purpose of obtaining drugs. Father never provided proof to DCS that he was legally employed. These facts, together with the requirements of the permanency plans with which Father was not in substantial compliance, lead us to conclude that the conditions that led to Gabriel's removal or other conditions still persist that would in all probability cause Gabriel to be subjected to further neglect and prevent Gabriel from being safely returned to Father's care. Third, Father has not demonstrated a likelihood that these conditions will be remedied anytime soon to allow Gabriel to be returned safely to his care.

Finally, the record contains evidence that Gabriel's foster parents are interested in adopting him and that Gabriel is thriving with his foster family. Gabriel's foster mother gave birth to a child shortly after Gabriel was placed in her and her husband's home, and the evidence shows that Gabriel treats the younger child as his sibling and calls his foster mother and father "Mom" and "Dad." The continuation of Father's relationship with Gabriel greatly diminishes the opportunity for Gabriel to be permanently integrated into the foster family's home, as the foster parents desire. Thus, we affirm the trial court's determination that DCS proved the persistence of conditions ground for termination of Father's rights by clear and convincing evidence.

## B. Best Interest Analysis

Having found that clear and convincing evidence exists to terminate Father's parental rights, we next consider whether the trial court properly determined that termination of his rights is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah S.*, 455 S.W.3d at 555).

The factors a trial court is to consider in determining whether terminating a parent's rights to a child is in the child's best interests are set forth in Tenn. Code Ann. § 36-1-113(i) and include the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The Tennessee Supreme Court has addressed the steps DCS must take to reunify a family before a court will terminate a parent's rights, explaining:

[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *see also In re Giorgianna H.*, 205 S.W.3d at 516; *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

*In re Kaliyah S.*, 455 S.W.3d at 555-56.

The trial court conducted a best interest analysis and found as follows:

1. [Father] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of [his] respective parent(s).

2. [Father] has failed to effect a lasting adjustment even after reasonable efforts by DCS for such duration of time that a lasting adjustment does not appear reasonably possible.

3. . . . [Father] did attend therapeutic supervised visits with his son for a period of time. However, it is noted that he missed 19 of the 56 scheduled visits with his son and that his visits with his child were sporadic.

4. The Court found that there has not [been] a meaningful relationship established between the parents and the child. Rather the Court found that the child and the foster parents have a relationship.

5. On the hearing date, the child had been removed from his parents for nearly two years.

6. The child will turn three years old [in] November . . . 2017. The child has been in the foster parents' care longer than he was in his parents' care. The Court found that "it's one thing to have a child; it's another thing to raise the child."

7.  The child has remained continuously in DCS custody since December 4, 2015. The child has remained in the same foster home his entire custodial episode. The child is very much bonded with the foster parents and their daughter. Likewise the foster parents and their daughter are very bonded to the child. The foster parents love the child. The foster parents desire to adopt the child and provide him with a permanent home.

8. The foster parents are well able to care for the child and to provide for his needs.

9. Despite being court ordered to do so, [Father] has failed to provide the Department or the Court with information evidencing safe stable housing.

10. A change of caretaker and physical environment is likely to have a negative effect on Gabriel's physical, emotional, psychological and/or medical condition.

11. As to whether the Respondents have shown psychological abuse or neglect towards the child, the Court noted the Respondents had the child with them when they were shoplifting and the biggest problem was that when the parents were arrested; the child had nowhere to go and there was no one to take care of the child.

12. As to whether, the physical environments of the parents' home is healthy and safe, the Court found that we [the Court, DCS and the GAL] do not know where the physical environment of [Father] is and as such no one can vouch as to the safety and stability of the same. . . .

13.  The Court found that the parents' home environment was not stable and that there was evidence of alcohol and controlled substance use by [Father] as result of his DUI and his two positive hair follicle drug screens for cocaine.

14.  In addressing whether the parents' mental or emotional status would be detrimental to the child to prevent the child from safely returning to his parents' home, the Court found that it would have been helpful if [Father] had had a mental evaluation. The Court found regarding [Father], ". . . every time it is something different.  A different house, a different person, a different story and the truth is somewhere in the middle but there is no stability . . . ."

15.  [Father] has [not] paid child support consistent with the child support guidelines.

16. The record is clear that DCS made reasonable efforts to assist [Father] with remedying the conditions that necessitated foster care for this child.

17. The Department made further reasonable efforts by providing for the child[]'s medical, and dental needs, and follow-up services as recommended and providing the child[] with monthly and/or bi-monthly visits and intensive case management to meet the child[]'s needs.

18. Therefore, the Court finds by clear and convincing evidence that DCS made reasonable efforts in this case.

19. The Court thus finds by clear and convincing evidence that it is in the best interests of [Gabriel] that the Termination of Parental Rights Petition is granted/sustained as to [Father].

Father does not challenge the trial court's best interest analysis, and we find the record supports the trial court's findings set forth above. We agree with the trial court that DCS proved by clear and convincing evidence that terminating Father's rights to Gabriel is in Gabriel's best interest. Accordingly, we affirm the trial court's judgment terminating Father's parental rights to Gabriel.

IV. CONCLUSION

We affirm the trial court's judgment terminating Father's parental rights on the grounds of abandonment by willful failure to support, substantial noncompliance with the permanency plans, and persistence of conditions, and we vacate the trial court's termination on the ground of failure to provide a suitable home. This matter is remanded with costs of appeal assessed against Brock R.B., for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE

- 23 -